**PHILIP MORRIS USA, INC., Plaintiff,**

v.

**OTAMEDIA LIMITED, Defendant.**

**No. 02 Civ. 7575(GEL).**

United States District Court,
S.D. New York.

Aug. 20, 2004.

Amy W. Schulman, Piper & Marbury, Rudnick & Wolfe, LLP, New York, NY, James D. Mathias, Piper & Marbury, Rudnick & Wolfe, LLP, Baltimore, MD, Anthony D. Boccanfuso, Arnold & Porter, LLP, New York, NY, Leslie Wharton, Roberta L. Horton, Arnold & Porter, Washington, DC, Bruce E. Falby, Hill & Barlow, Boston, MA, Warren J. Rheaume, Heller Erhman White & McAuliffe, LLP, Seattle, WA, Kenneth L. Chernoff, Deborah Kravitz, Heller Erhman White & McAuliffe, LLP, Washington, D.C., Jennifer L. Larson, Heller Erhman White & McAuliffe, LLP, New York, NY, for Plaintiff.

Howard J. Shire, Kenyon & Kenyon (Dana R. Kaplan, on the brief), New York, NY, for Defendant.

### OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Philip Morris USA, Inc. ("Philip Morris") filed this action on September 19,

2002, seeking declaratory and injunctive relief for trademark infringement, unfair competition, and other violations of the Lanham Trade–Mark Act, July 5, 1946, 60 Stat. 427, and analogous state law, arising from defendant Otamedia's unauthorized sale of Philip Morris cigarettes over the Internet. Otamedia initially retained counsel, who sought additional time for Otamedia to answer and appeared on its behalf at a status conference in November 2002, but on January 16, 2003, counsel advised the Court that Otamedia would take no further action in this lawsuit. Philip Morris then moved for a default judgment, which the Court (Schwartz, J.) granted by Judgement and Order dated January 27, 2003 ("Judgment"). The Judgment enjoins Otamedia from, among other things, "using or licensing the use of ... the Philip Morris USA Marks" and "supplying cigarettes, fulfilling orders for drop shipping, and/or facilitating the importation into the United States of Philip Morris USA Gray Market Cigarettes for any other website, customers, or affiliates, or any member of its 'affiliate program.'" (Judgment ¶¶ 9, 11.)

Philip Morris now seeks to modify the Judgment to order Otamedia to transfer to Philip Morris ownership of certain Internet domain names by which, Philip Morris alleges, Otamedia continues to violate the Judgment. Because of the unusual nature of the relief sought, the Court held an evidentiary hearing on May 13 and 18, and June 1, 2004, and invited briefing on the issues both before and after that hearing. Based on the findings of fact and for the reasons set forth below, Philip Morris's application will be granted.

**1.** According to Philip Morris, Otamedia, which was first incorporated in the Isle of Man and later in Belize, had for some time been "duly listed in the Business Registry for the District of Lugano, thus establishing a legally cognizable branch in Switzerland,"

## BACKGROUND

### I. *The Judgment*

Because Otamedia defaulted, the following facts, drawn principally from the complaint and the Judgment, must be deemed admitted. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.1992). Philip Morris, a Virginia corporation with its principal place of business in New York, manufactures and sells cigarettes, including the well-known Marlboro brand. (Compl.¶¶ 10, 12–13.) Otamedia, a Belizean corporation with its principal place of business in Switzerland,[1] sells cigarettes, wines, cigars, food products, and "gadgets" through its website, which can be accessed at www.yes-moke.com and www.yessmoke.com ("Otamedia Website"). (DX 8 ¶ 11; 9/8/03 D. Br. 3.) The Otamedia Website displays logos and images confusingly similar to those of Philip Morris trademarks (Judgment ¶ 6; *see, e.g.*, Smith Aff., Ex. B (printout of the Otamedia Websites on July 7, 2003)), and through it, Otamedia illegally sells to customers in the United States Philip Morris cigarettes intended for sale abroad ("gray market cigarettes"). (Judgment ¶¶ 2, 4.) The Otamedia Website also infringes and dilutes Philip Morris trademarks, violates both the Imported Cigarette Compliance Act, 19 U.S.C. § 1681 *et seq.* and New York General Business Law § 360–1, and constitutes false advertising and unfair competition under the Lanham Act. (*Id.* ¶¶ 2–8.) The Judgment enjoins Otamedia from continuing to perpetrate these acts. (*Id.* ¶¶ 9–11.) It also orders "Otamedia [to] post a notice on [its] website[ ] which informs customers that Otamedia does not sell Philip Morris

but has recently sought to reduce, if not eliminate, its Swiss presence, instead using a new vehicle, Yeswe Ltd., to act as the registrant for its domain names. (10/30/03 P. Br. 11–12.)

branded cigarettes to customers residing in the United States." (*Id.* ¶ 13.)

## II. *The Order to Show Cause*

On August 4, 2003, Philip Morris brought an order to show cause seeking modification of the Judgment by entry of an order transferring ownership of the Otamedia Website domain names—www.yesmoke.com and www.yessmoke.com—to Philip Morris. In its application, Philip Morris alleged that Otamedia continues to violate the Judgment and disregard the injunction entered against it; that it "has not benefitted from the relief ordered in its favor"; and that "[a]bsent transfer to Philip Morris USA of the domain names . . ., Philip Morris USA has no other readily available recourse or remedy and will continue to be irreparably harmed." (7/14/03 P. Br. 2, 13.)

## III. *The Relief Requested: Transfer of Otamedia's Domain Names*

The Internet is a global network of computers. It identifies the address of electronically-stored information by alphanumeric designations called domain names (e.g., "yesmoke.com"). (Compl. ¶¶ 27–28.) On the World Wide Web, "a system of Internet servers that supports documents formatted in the HTML computer language," domain names enable users to navigate among pages of graphics and text, which can be linked together to form websites (e.g., "www.yesmoke.com"). (*Id.* ¶ 31.) Domain names consist of no fewer than two parts. The latter part indicates the essential nature of the source of the electronic information, for example, ".gov" for U.S. government sources, ".edu" for educational institutions, ".org" for organizations, and ".com," for commercial enterprises. (*Id.* ¶ 29.) The former part

identifies the name or trademark of the individual or company that owns the domain name. (*Id.* ¶ 30.) Commercial enterprises, including Otamedia, at times use the Web to market and sell products.

To acquire a domain name, a company must purchase and register it with one of several registrars, including Network Solutions Inc. For an annual fee, the registrant receives control over the domain name, which it can use to store information and create a website. (7/14/03 P. Br. 3.) Otamedia registered the yesmoke.com and yessmoke.com domain names with Network Solutions. (Larson Aff., Ex. B.) Through its corresponding Website, it illegally sells gray market Philip Morris cigarettes into the United States. (Judgment ¶¶ 2, 4.)

By letter dated May 6, 2003, VeriSign, Inc., the parent company of Network Solutions, notified Philip Morris that

Network Solutions is merely the registrar of one or more of the disputed domain name registrations. As envisioned by 15 U.S.C. §§ 1114(D)(i)(II)(aa), 1125(d)(2)(C)(ii), 1125(d)(2)(D)(i)(I), and as further provided in Network Solutions' standard service agreement with its registrants and the dispute policy incorporated therein, [Network Solutions] ha[s] enclosed the original Registrar Certificate for your deposit with the Court. . . .

By this letter, we further notify you and the domain name registrant [i.e., Otamedia] that, in accordance with 15 U.S.C. §§ 1115(D)(i)(II)(bb)          [and] 1125(d)(2)(i)(II), the disputed domain name registration will not be transferred, suspended, or otherwise modified during the pendency of th[is] action, except upon order of the court.

(Larson Aff., Ex. A.)[2] On May 9, 2003, Philip Morris "deposited the Registrar

---

**2.** Title 15 U.S.C. § 1125(d)(2)(D)(i) provides that in an action *in rem* against a domain

name,

Certificate with the Court, which conveyed to the Court complete control and authority over the [yesmoke.com and yessmoke.com] Domain Names, and served Otamedia with a copy of the Notice of Deposit." (7/14/03 P. Br. 5; *see* Larson Aff., Exs. B, C.) By this order to show cause, Philip Morris asks the Court to modify the Judgment to include an order transferring ownership of Otamedia's domain names to Philip Morris.[3] According to Philip Morris, "[u]pon order of this Court, Network Solutions will transfer the . . . Domain Names to Philip Morris USA, wh[ich] can then prohibit Otamedia from using [them] and the related Infringing Websites to further frustrate the intended result of the Judgment." (P. Br.12.)

IV. *Proceedings on the Order to Show Cause*

By letters dated August 18 and September 4, 2003, Otamedia advised the Court that it had retained new counsel "solely in connection with the pending request by the plaintiff to modify the existing default

> [u]pon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar . . . shall
> > (I) expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and
> > (II) not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.
>
> This is not an action *in rem* against Otamedia's domain names; Philip Morris sued Otamedia personally. But in view of the statutory provisions cited in VeriSign's letter, Network Solutions' actions in response to Philip Morris's complaint appear to be appropriate. Title 15 U.S.C. § 1125 neither states nor implies that an *in rem* action against the domain name constitutes the exclusive remedy for a plaintiff aggrieved by trademark violations in cyberspace.

judgment to include the transfer of two domain names to the plaintiff," and on September 9, 2003, Otamedia submitted a brief in opposition to Philip Morris's application, accompanied by the declaration of one Carlo Messina, the self-described "Director of the Legal Department for Otamedia Limited."[4] (DX 8 ¶ 1.) Messina declared under oath that Otamedia has been in business for more than seven years, during which time it has "sold its products and built up its . . . reputation exclusively through its Internet website associated with the 'Yesmoke.com' and 'Yessmoke.com' domain names." (*Id.* ¶ 3.) While conceding that Otamedia continues to sell gray market Philip Morris cigarettes, he emphasized that it also sells "wines, cigars, gadgets, and cigarettes of various [other] brands to customers throughout the world." (*Id.* ¶ 7.) In fact, according to Messina, Otamedia's sales of Philip Morris cigarettes represent "merely a fraction of the various products Otamedia sells" (*id.* ¶ 11), "approximately 18% of the total products listed on Otamedia's website."[5] (*Id.* ¶ 18.) Messina objected

3. In subsequent submissions, Philip Morris also asks that the Court order the transfer of "yesmoke.ch" and "yessmoke.ch," Otamedia's new domain names, because "any relief the court grants short of a transfer of the .ch domain names will be illusory." (10/30/03 P. Br. 1; 6/11/04 P. Br. 4 & n. 4.) While couched as part of the same order to show cause, Philip Morris did not request this relief in its initial motion papers, and has not established an adequate legal or factual basis for it. Accordingly, this request will be denied without prejudice at this time.

4. The significance of this title is unclear. Messina, who is not a lawyer, testified paradoxically that "[w]e [Otamedia] don't have a specific legal office, legal department, but I'm the one in charge of it." (Tr. 245.)

5. Of course, what matters is not the number of Philip Morris products as a percentage of the total number of distinct products sold by Otamedia; it is the percentage of Otamedia's *sales* comprised of Philip Morris products. In

that to transfer the Otamedia Website domain names to Philip Morris would be to destroy Otamedia's entire business, the majority of which, he claimed, does not violate the Judgment. (*Id.* ¶¶ 9–10, 20–22.)

Based on Messina's testimony, Otamedia thus argued that Philip Morris was seeking unduly broad and inappropriate relief: The proposed modification of the Judgment would, in practice, constitute a new judgment, which would effectively proscribe a vast swath of entirely lawful sales essential to Otamedia's business. "To grant Philip Morris'[s] request for relief," Otamedia concluded, "would be a classic case of using an elephant gun to kill a flea, given the large number of products and vast geographic area outside the United States to which Otamedia sells." (9/8/03 D. Br. 9.) Otamedia contended that Philip Morris could and should pursue less drastic remedies, such as bringing suit before the International Trade Commission or seeking to enforce the Judgment in Switzerland. (*Id.* 6; 9/11/03 Tr. 6.)

If gray market Philip Morris cigarettes account for only a small fraction of Otamedia's sales, the vast majority of which remain beyond the scope of the Judgment, then the transfer of the Otamedia Website domain names, thereby "destroying Otamedia's entire business" (9/8/03 D. Br. 1), would arguably be inequitable—a form of relief to be ordered, if at all, only after the exhaustion of less severe remedies. If gray market Philip Morris cigarettes account for a substantially larger percentage of its total sales, then the relief Philip Morris seeks may well be appropriate, particularly in view of Otamedia's decisions,

first, to ignore this litigation, and second, to flout the resulting default Judgment.

Neither party, however, initially provided the Court the relevant data, or even estimates, concerning Otamedia's sales. While Philip Morris contended, not without some force, that Otamedia continues to sell Philip Morris cigarettes despite the Judgment because "that's their biggest market," it complained that it had been unable to quantify the percentage of Otamedia's sales proscribed by the Judgment "because Otamedia won't share that information." (9/11/03 Tr. 10–11.) Given the significance of this information to the equities in this case, and the apparently unprecedented nature of the relief Philip Morris seeks, the Court gave Philip Morris and Otamedia two additional weeks to provide this and other relevant information, as well as to make further legal submissions.

On September 26, 2003, Philip Morris submitted a supplemental brief and declarations, with voluminous exhibits annexed, from Jennifer L. Larson, Barry Krivisky, Leslie Wharton, John Sheesley, and Michael Sandifer. Based on this evidence, Philip Morris estimated "that sales of Philip Morris products account for approximately 66% of Otamedia's overall cigarette sales revenue in the United States" since the entry of the Judgment. (9/30/03 P. Br. 11 n. 10.) Moreover, Philip Morris contended, between May 2002 and August 2003, 92.3% of "unique" visitors to the Otamedia Website—that is, discounting additional visits by Internet visitors who accessed the Otamedia Websites on more than one occasion—were based in the United States, which suggests that Otamedia sold a com-

---

theory, Otamedia could offer thousands of products for sale, rendering the percentage of Philip Morris products minuscule. But if 90% of its sales consist of those Philip Morris products, it would be highly misleading to say that Philip Morris products account for only

18% of Otamedia's business. Indeed, as found by the Court below, this scenario, albeit at a somewhat less hyperbolic level, is a roughly accurate portrayal of Otamedia's Internet business.

parably high percentage of its Philip Morris cigarettes to U.S. residents. (*Id.* 15.)

By contrast, Messina, on behalf of Otamedia, submitted another declaration in which he affirmed that (1) "[o]f the total number of unit products sold worldwide by Otamedia over the past twelve months, Philip Morris products sold in the United States accounted for only 3.4%," and (2) "[t]he sale of Philip Morris cigarettes in the United States accounted for only 3.2% of Otamedia's worldwide revenue for the past twelve months." (DX 10 ¶ 2.) He also declared under oath that "Otamedia retains sales invoices for each shipment and order," the documents from which these percentages had been derived, but he declined to provide them because such disclosure would allegedly violate Swiss privacy laws. (*Id.* ¶ 3.)

In short, the parties submitted evidence indicating dramatically different sales figures for Philip Morris products subject to the Judgment. After ordering Otamedia to provide discovery to Philip Morris, including access to the data underlying Messina's declaration, the Court held a hearing in May and June 2004 to resolve this and other disputed issues of fact relevant to Philip Morris's application to modify the Judgment. At that hearing, the parties offered fact and expert witness testimony, documentary evidence, and data analysis.

## FINDINGS OF FACT

The Court finds, *first,* that Otamedia's Internet business is devoted, almost exclusively, to selling cigarettes; *second,* that it sells a substantial percentage, and very likely a majority, of such cigarettes to customers located in the United States; and *third,* that a substantial percentage, and very likely a majority, of those cigarette sales consist of gray market Philip Morris cigarettes and therefore violate the Judgment. The evidence overwhelmingly supports these findings.

### I. *Otamedia's Refusal to Comply with the Judgment*

At the threshold, even though the burden of proof is on Philip Morris to establish the facts that entitle it to the modification it seeks, Otamedia confronts a substantial negative inference. Otamedia maintains that only a tiny fraction of its Internet sales, about 3%, violate the Judgment, while the remainder of its business involves either sales of Philip Morris brand cigarettes to customers located outside the United States, which remain beyond the scope of the Judgment, or sales of other products, including cigarettes manufactured by corporations other than Philip Morris, wine, pasta sauce, olive oil, fruit preserves, and "gadgets," which the Judgment likewise does not touch. Were that true, it is difficult to fathom why Otamedia does not simply comply with the Judgment, sacrifice the (presumably insubstantial) income derived from sales of Philip Morris cigarettes to U.S. customers, and thereby avoid the burden and expense of litigating modification of the Judgment. Indeed, Otamedia's decision to defend itself only *now,* after choosing to relinquish its opportunity to litigate the merits of the underlying trademark infringement issues, is all the more conspicuous and belies any assertion that, as Otamedia has suggested at various times, it is pursuing some kind of anti-corporate crusade of principle. Absent some alternative explanation, the natural, and virtually compelled, inference is that the unlawful sale of Philip Morris cigarettes to U.S. customers, far from being a tiny fraction of Otamedia's business, is a major portion, if not the mainstay, of that business.

Otamedia has never offered an explanation, still less a satisfactory one, for its

persistent defiance of the Judgment. In its opening statement at the hearing, Otamedia said that it wanted to offer Messina's testimony in support of its view that "it should [not] have to listen to . . . a large multinational monopolistic company," by which it presumably meant Philip Morris. (Tr. 7.) But Philip Morris did not and, of course, could not unilaterally enjoin Otamedia's sales. This Court ordered Otamedia to cease to sell Philip Morris cigarettes into the United States as part of the Judgment, which it entered after giving Otamedia a full and fair opportunity to defend itself. Otamedia consciously decided not to avail itself of that opportunity, whether because it believed, allegedly on the advice of Swiss counsel, that the Court lacked personal jurisdiction (9/11/03 Tr. 5); or because Philip Morris requested discovery that Otamedia deemed "blatantly in violation of Swiss law" and the privacy rights of its customers (Tr. 8, 205, 279–80); or based on "equitable considerations" (*id.* 10); or, as seems most likely, because, as Messina testified on direct, when Philip Morris filed this action, Otamedia did not appreciate that Philip Morris might one day seek to shut down the Otamedia Website by obtaining an order transferring ownership of the yessmoke.com and yesmoke.com domain names.[6] (*Id.* 241.)

Whatever its decision calculus, Otamedia, after initially appearing by counsel, chose not to defend itself, refused to appear or participate further in the action, and allowed the Judgment to be entered against it by default. To date, Otamedia has not sought to reopen the Judgment; rather, it has persistently and overtly flouted the Judgment by selling Philip Morris cigarettes to U.S. customers. (Tr. 280.) From this history, the Court infers that Otamedia has now decided to enter an appearance in this case because it earns a large percentage of its revenues by violating the Judgment and recognizes that Philip Morris for the first time seeks a form of relief, whether characterized as a modification or an expansion of the Judgment, that threatens those revenues.

## II.   *The Otamedia Website*

The Otamedia Website is manifestly devoted to selling cigarettes, in particular, Philip Morris brand cigarettes, and in particular, to U.S. customers. First, as Michael William Finnie, a computer forensics specialist retained by Philip Morris, explained, to access the Otamedia Website, Internet users must either know or find— by using an Internet search engine such as Google[7]—its uniform resource locator ("URL"), colloquially known as a Web address. (Tr. 103–04.) The URLs for Otamedia, www.yessmoke.com and www.yesmoke.com, clearly constitute not-so-subtle variations on a combination of words encouraging people to smoke.[8] Sec-

---

6.   Otamedia may well have calculated that the Judgment itself posed no real threat to its business, given the obstacles to enforcing it in any meaningful way against a foreign entity.

7.   At the hearing, Finnie demonstrated that when an Internet user types the term "online cigarettes" into Google, its search engine locates the Otamedia Website. The link to the Website provides a truncated version of what appears in its title; for Otamedia, it prominently indicates the sale of Marlboro cigarettes (Tr. 104): "YESMOKE online cigarettes ship—Marlboro Red, Marlboro Lights . . ." (*Id.;* PX L.)

8.   Since some time in September 2003, these URLs automatically redirect Internet users to http://www.yesmoke.ch. (Tr. 198, 236.) The ".ch" extension signifies that the domain name or website is registered in Switzerland; "ch" stands for *Confederation Helvetique.* (Tr. 198.) Messina testified that Otamedia began to use the Swiss domain name for its Website as a "defensive move" (*id.*) against Philip Morris's application. Philip Morris also represents that in anticipation of an adverse ruling, Otamedia has registered a handful of new domain names that automatically redirect Internet users to the Otamedia Web-

ond, at the top of the first page of the Otamedia Website, the byline "Your online cigarette store" appears above a picture of a man in a "Tirolean hat" lighting a cigarette, an image conspicuously similar to the "Marlboro Man" character used by Philip Morris in its marketing and advertising campaigns.[9] (Tr. 116; PX L, WW.) Third, until at least late April 2004, several weeks before the first day of the hearing in this matter, the Website displayed packs of Marlboro Reds and other Philip Morris brand cigarettes; on the date of the hearing, packs of Camel cigarettes appeared in their stead. (Tr. 110–11; Smith Decl., Exs. B, C (printouts of the Otamedia Website on July 7, 2003, and May 22, 2003, respectively); PX L, WW.)

Fourth, the most cursory glance at the Otamedia Website establishes beyond doubt that it is devoted, first and foremost, to selling cigarettes, particularly Philip Morris brands to customers in the United States. On the first page, six of the eight pictures displaying items for sale show packs of cigarettes; the other two show cigars and delicatessen items. (Tr. 111.) Even though only one of the six pictures of cigarette packs shows Philip Morris brands, viewers who click on the link at the bottom of the first page entitled "See our wide selection of available brands" will be automatically taken to a page that displays *only* Philip Morris brand cigarettes. (*Id.* 111–13.) Furthermore, on the page from which customers can place orders, the drop-down menu asking viewers to select their location, while including countries throughout the world, defaults to the states of the United States, listed alphabetically. (*Id.* 112.) Finally, the "Continue to" navigation bar at the bottom of

virtually every page on the Otamedia Website, including those that display delicatessen and other non-tobacco products, defaults to "Philip Morris." (*Id.* 118–19.) In short, the Otamedia Website's content strongly suggests that it is designed, first and foremost, to sell cigarettes, and especially Philip Morris brand cigarettes to U.S. customers.

Otamedia's effort to portray itself otherwise only eroded its already tenuous credibility In his first declaration, Messina testified that "[a]side from Otamedia's retail Internet business, Otamedia invests considerable time, energy, and money to provide comprehensive commentary and criticism ... on subjects related to tobacco and smoking." (DX 8 ¶ 6.) At the hearing, he went further, describing Otamedia as "the most visited Web site for tobacco information in the world," including discussion and analysis of tobacco distribution, quality, policy, and "business conduct." (Tr. 195–96.) He testified that Otamedia offers information to the public for free (*id.* 196; DX 8 ¶¶ 6, 23–26), and finances research at the University of Padua, which has led to the development of a "water filter which is much less damaging than the filter [used by] the tobacco industry." (Tr. 196.) But with few exceptions, the only "tobacco information" published by Otamedia on its Website concerns this very lawsuit; it consists almost exclusively of manifestly self-serving tirades against Philip Morris. Nowhere does it mention the filter supposedly developed by Otamedia's research scientists; nor does it say anything about Otamedia's supposed "own line of products, including 100 percent nat-

---

site, including yespeedy.com, yesspeedy.com, yes-speedy.ch, and otamedia.com. (P. Proposed Findings of Fact and Conclusions of Law 1 n. 1.)

9. Exhibit H to the complaint shows that, until recently, the Otamedia Website displayed a character that resembled the Marlboro character even more closely, wearing the cowboy hat of the Marlboro Man rather than the more Alpine headgear now sported. (PX N, Ex. H.)

ural tobacco cigarettes, without any preservatives." (Tr. 7; PX M.)

At other times, Otamedia has sought to downplay the focus of its Website on tobacco, asserting that its sale of other products, such as olive oil, wines, cigars, preserves, and T-shirts, generates the majority of its income. (DX 8 ¶¶ 11–20; DX 10 ¶ 2.) For instance, Exhibit A to Messina's supplemental declaration, which purportedly summarizes Otamedia's sales during the period from September 2002 to August 2003, attributes only 44.59% of Otamedia's U.S. sales to cigarettes, corresponding to $7,177,565.92 in income, while showing that Otamedia sold more than $4.5 million worth of "gadgets," some $2.6 million of wines, and $1.7 million of cigars. (DX 10, Ex. A.) Worldwide, according to the chart, about one-third of Otamedia's revenues during the same period derived from the sale of various delicatessen products (*id.*)—more, according to Messina's testimony at the hearing, than the percentage of Otamedia's revenue derived from cigarette sales. (Tr. 252–53.)

Yet at the hearing, Messina effectively conceded that Otamedia did not *begin* to sell delicatessen items until September 2003. (Tr. 251–52.) As for the $4.5 million worth of "gadgets" allegedly sold to U.S. customers during the same one-year period, Messina testified that these were "Yesmoke logo polo shirts." [10] (Tr. 253.)

The summary chart attached to his second declaration represents that, worldwide, Otamedia sold nearly one million of them in the same year, netting some $14 million in revenues. (DX 10, Ex. A.) Notwithstanding the apparent success of the polo shirts, Otamedia abruptly ceased to sell them, as well as delicatessen items, in October 2003. (Tr. 254.) At that time, according to Messina, Otamedia decided to focus on tobacco only. (*Id.* 254–55.) By Messina's account, Otamedia thus began selling delicatessen items in September 2003, decided to stop selling them in October 2003,[11] one month later, but somehow earned more than $26 million in delicatessen item sales between September 2002 and August 2003. (DX 10, Ex. A.)

This highly incredible testimony, and the Otamedia Website's blatantly obvious focus on selling cigarettes, particularly Philip Morris cigarettes, renders preposterous any assertion that Otamedia is either a purveyor of free tobacco information or an Internet retailer of delicatessen items and polo shirts (with only a minor, less profitable trade in cigarettes). Messina's efforts to portray Otamedia as anything but an Internet retailer of cigarettes were clearly disingenuous and only bolstered the inference that Otamedia earns the vast majority of its revenues by sales that violate the Judgment.[12]

10. Messina could not recall what other gadgets Otamedia sold (Tr. 253), and Exhibit A to his first declaration, which purported to list the items Otamedia sold as of September 2003, included, under the heading "Gadget," nothing but Yesmoke polo shirts. (DX 8, Ex. A.)

11. A printout of the Otamedia Website as of March 22, 2004, shows that notwithstanding Otamedia's purported business decision to cease selling delicatessen products (or indeed any products but cigarettes) in October 2003, Otamedia continued to sell such products six months later. (PX M; Tr. 109–10.)

12. Even if the Otamedia Website formerly sold delicatessen items, cigars, wines, and polo shirts, Messina made clear that Otamedia now intends to focus its "www.yesmoke.com" Website exclusively on tobacco, relegating non-tobacco products to a different website. (Tr. 254–55.) In view of the purported success of these other items, it is curious that Otamedia has not identified the address of that website or otherwise offered any proof that it even exists.

## III. *Otamedia's Sales Data*

To substantiate its claim that only about 3% its sales during the period September 2002 through August 2003 violated the Judgment (DX 10 ¶ 2),[13] Otamedia provided two batches of sales data. The first, provided on November 5, 2003, purports to reflect Otamedia's sales during the period May through August 2003; the second, provided on April 27, 2004, purports to reflect Otamedia's sales during the period September 2003 through January 2004. (6/25/04 D. Br. 21.)

Several threshold observations cast doubt on the authenticity and reliability of this data, even before reviewing its analysis by the witnesses. On September 11, 2003, the Court ordered that, within two weeks, Otamedia provide "documents and tangible information" to support its assertion that only a tiny fraction of its sales violate the Judgment. (9/11/03 Tr. 21–24.) In his supplemental affidavit, submitted on September 26, 2003, Messina asserted that "[t]he sale of Philip Morris cigarettes in the United States accounted for only 3.2% of Otamedia's worldwide revenue for the past twelve months"; represented that "Otamedia retains sales invoices for each shipment and order, which would be the documents from which [this percentage is]

ultimately derived"; declined to provide the invoices, "some 6 million," because their production "would be unduly burdensome and cost tens of thousands of dollars"; but invited Philip Morris to come to Switzerland to review them during Otamedia's normal business hours. (DX 10 ¶¶ 2–3.) Not until November did Otamedia provide any corroborative documentation pursuant to the Court's order, and even then, it only provided data covering the last four months of the one-year period relied on by Messina in his declaration. In fact, to date, Otamedia has provided no evidence at all to corroborate its assertions about its sales for the remaining eight months, September 2002 through April 2003. (Tr. 264–67.)

Furthermore, contrary to Messina's declaration, Otamedia could not and did not provide "sales invoices for each shipment and order," because, contrary to that declaration, Otamedia does not, in fact, "retain[ ] sales invoices for each shipment and order."[14] (DX 10 ¶ 3.) Indeed, Messina testified, Otamedia does not retain invoices at all; it only keeps sales data for a three— or four–month period, after which it expunges that data from its database, purportedly to protect customer privacy and to save electronic space.[15] (Tr. 204–

13. According to Messina's supplemental declaration, Philip Morris cigarettes represented 16.1% of the total cigarettes sold by Otamedia to U.S. customers during the period September 2002 through August 2003 (DX 10, Ex. B); Philip Morris products represented 3.4% of "the total number of unit products sold worldwide by Otamedia" during the same period; and sales of Philip Morris cigarettes to customers in the United States accounted for 3.2% of Otamedia's "worldwide revenue" during the same period. (DX 10 ¶ 2.)

14. Given that Otamedia ultimately produced its sales data (four months rather than a year) by making it available on a secure website, it is difficult to understand why Messina thought that such disclosure "would be undu-

ly burdensome and cost tens of thousands of dollars." (DX 10 ¶ 3.) Furthermore, Messina conceded that contrary to the representations in his declaration, he has no idea how many documents Otamedia possessed as of the date of that declaration; by "six million invoices" (*id.*), he explained, he merely intended to estimate "the sales volume that the company had in a specific period." (Tr. 275–76.)

15. Otamedia produced "email confirmations," which it "recreated" for this litigation, even though, according to Messina, it retains a database of sales information for use in responding to customer questions and complaints. (Tr. 260–61; *see also* 6/26/04 D. Br. 4–9.)

06, 275.) It is therefore a mystery how, in September 2003, Messina calculated the percentage of Otamedia's Philip Morris sales to U.S. customers for the previous twelve months, for presumably, Otamedia had by that time already expunged the first eight months of data for that period. (*Id.* 228.) At the hearing, he nonetheless testified that to prepare his declaration and arrive at the representations he made in it about Otamedia's sales over the past year, he relied on "sales data kept in the ordinary course of Otamedia's business." (*Id.* 204; *see also id.* 209.)

Finally, it became clear at the hearing that Messina lacks personal knowledge sufficient to attest to the authenticity and reliability of any of the data. Messina did not calculate the sales data himself; he *directed his computer programmers to prepare it.* He does not understand how they did so. Nor did he check the accuracy of their work.[16] (Tr. 204, 209, 224, 229–30, 234, 262, 267, 271–73.) Indeed, on cross-examination, after being confronted with an analysis of the data that will be considered below, Messina conceded that it appeared that his programmers erred in creating the first four months of data provided to Philip Morris, and that he could not vouch for the reliability of the latter four months. (*Id.* 271–73, 284.) Hence, Messina's testimony alone casts serious doubt on both the authenticity and reliability of Otamedia's purported sales data.[17]

Analysis of the data itself completely undermines its reliability. It discloses, at best, an uncannily coincidental series of errors on the part of Otamedia's former programmers; at worst, a deliberate attempt by Otamedia to deceive the Court by supplying fraudulent information; and in any event, evidence that merits no weight whatsoever.

First, Finnie's analysis of Otamedia's sales data for May to August 2003 showed that, according to that data, for each region of the world identified by Otamedia (Canada, Europe, the United States, and the rest of the world), Otamedia sold the *exact* same percentage—to the one-one-thousandth of a percent—of Philip Morris products in May, June, July, and August. That is, although the specific number of Philip Morris products allegedly sold to each region of the world changed from month to month, the percentage of Philip Morris products as a share of Otamedia's cigarette sales worldwide remained constant over the period identified: 0.492% for Canada, 2.522% for Europe, 1.450% for the United States, and 3.280% for the rest of the world. (PX HH; Tr. 153.) Finnie charitably described this as "the biggest statistical anomaly [he] ha[d] ever seen."

16. Otamedia's decision to offer Messina as its sole fact witness is puzzling for a number of other reasons. Messina testified that his responsibilities consist entirely of advising Otamedia on legal issues. (Tr. 245–46.) He is not involved with marketing, distribution, sales or any other aspect of the business that would give him first-hand knowledge of the facts in dispute here. He does not own shares of Otamedia or serve on its board of directors. (*Id.* 246.) He is unfamiliar with the marketing and distribution aspects of Otamedia's business (*id.* 258–59), and indeed, does not even know the name of the person who *would* know about "the quantities and frequency with which Otamedia purchases Philip Morris branded cigarettes." (*Id.* 259.)

Nor does he understand the "financial" or "accounting" aspects of Otamedia's business, including such basic matters as which bank Otamedia uses. (Tr. 263–64.) In short, his competence to testify about Otamedia's sales data, global markets, and revenues is questionable at best.

17. Philip Morris contends that Messina committed perjury. (6/11/04 P. Br. 11–14.) Were it necessary to reach the question, the Court would be inclined to agree. It suffices, however, to find Messina an utterly incredible witness whose testimony merits no weight whatsoever in the resolution of the factual issues presented by Philip Morris's application.

(*Id.* 154.) It is virtually impossible not to conclude that Otamedia, or at least its former programmers, simply began with these percentages and employed an algorithm to generate different purported sales figures for each of the reported months. This "statistical anomaly" at the very least completely undermines the reliability of the first four months of data.

Second, the data, which, Messina testified, had been taken from Otamedia's "server" (Tr. 210), shows that for each month from May 2003 through September 2003, Philip Morris brand cigarettes comprised only a small fraction of Otamedia's cigarette sales to U.S. customers. (DX 14, 15.) In May 2003, for instance, Otamedia purportedly sold 11,983 Philip Morris products (cartons of cigarettes) and 157,402 non-Philip Morris products to U.S. customers. (DX 15; Tr. 267.) In June, according to the same chart of Otamedia's data, which Messina testified that his programmers prepared (Tr. 109, 267), Otamedia sold 37,812 Philip Morris products and 176,169 non-Philip Morris products. (DX 15.) The sum of these numbers, for each respective month, equals Otamedia's total number of U.S. cigarette sales for that month. Dividing the number of Philip Morris products sold in a given month by that sum yields the percentage of Otamedia's sales to U.S. customers attributable to Philip Morris for that month. For example, for May 2003, 11,983 (Philip Morris sales) plus 157,402 (non-Philip Morris sales) equals 169,385 (total Otamedia sales to U.S. customers), and 11,983 divided by 169,385 equals 7.07%. (Tr. 267–69.)

At the hearing, Philip Morris demonstrated that for May, June, July, and August 2003, according to Otamedia's data,

Philip Morris's market share of Otamedia's total cigarette sales to U.S. customers came to 7.07%, 8.33%, 8.33%, and 8.33%, respectively. (PX AAA.) These calculations cast further doubt on the reliability of Otamedia's data. In the first place, Messina testified that Philip Morris products accounted for 16.1% of Otamedia's cigarette sales into the United States for the period September 2002 through August 2003. (DX 10, Ex. B.) Unless Philip Morris sales plummeted sharply in the last four months of that period, it is difficult to understand how that number can be accurate. (Tr. 270.) More significantly, however, these relatively simple calculations again disclose a "statistical anomaly" that strongly supports an inference that someone fabricated the data, for it is virtually inconceivable that the percentage of Otamedia's Philip Morris sales (to total cigarette sales) to U.S. customers remained exactly the same—to the one-one-hundredth of a percentile—for three consecutive months. Indeed, confronted with these improbable numbers, Messina conceded that Otamedia must have made a "mistake," which he ascribed to a database "prepared by programmers ... who currently are no longer working for [Otamedia]." (*Id.* 271; *see also id.* 229.)

Third, each individual sales record, for each month for which Otamedia provided data, includes in several places "yesmoke.ch," the Otamedia Website's current domain name. (PX JJ; Tr. 156–57.) But Otamedia began to use this domain name in late September or early October 2003, only after Philip Morris brought this application for modification of the Judgment to transfer ownership of the "yessmoke.com" and "yesmoke.com" domain names.[18] (Tr.

---

18. According to a Philip Morris exhibit, the domain name switched from "yesmoke.com" to "yesmoke.ch" on September 25, 2003. (PX C.) According to Messina, Otamedia changed the Otamedia Website's principal address earlier in September 2003. (Tr. 250.) In any event, the date of the switch antedated the time period when at least some of Otamedia's purported sales data show the "yesmoke.ch" designation.

236–37; DX 2A.) Yet Otamedia's purported sales records for the months from May through September 2003, *before* Otamedia switched to the ".ch" domain name extension, inform customers that questions should be sent to "customers@yesmoke.ch," and include messages thanking those customers "for shopping at www.yesmoke.ch!" (PX JJ.) Because Otamedia did not begin to use "yesmoke.ch" until late September or early October 2003, the logical inference is that someone fabricated the data *ex post facto* for at least the months from May 2003 through September 2003.

Finally, comparison of the purported individual records comprising each batch of data (PX V, W, X, Y, Z, AA) with actual email confirmations received by a real customer (PX J, K; Tr. 138–39), and Finnie's analysis of the Otamedia Website, revealed several inconsistencies that further support the inference that someone fabricated the purported Otamedia sales data.

- The customer's email confirmations contain a unique order number; the purported email confirmations that comprise the data do not. (Tr. 139.)
- The customer's email confirmations reflect the precise destination to which the product will be delivered (PX J, K); the purported email confirmations that comprise the data simply specify "USA" or "RoW," meaning "rest of world." (PX V–AA.) Similarly, for products other than Philip Morris cigarettes, rather than identify a specific product, the purported email confirmations that comprise the data simply identify the sales as "NOT PM BRANDS." (PX W, Z; Tr. 142.)

- The first batch of data contained price information for Philip Morris products only; the second batch for both Philip Morris and non-Philip Morris products. (Tr. 141.)
- Each email confirmation comprising the Otamedia sales data purports to reflect the sale of one carton of cigarettes (*e.g.*, PX V–AA; Tr. 145), yet the Otamedia Website only permits customers to purchase cartons in quantities of two or more. (Tr. 119.)

Messina attempted to explain away these inconsistencies. He testified that Otamedia redacted certain information from email confirmations before providing them to Philip Morris because disclosure of details about Otamedia's customers would have violated Swiss privacy laws. (Tr. 205, 233.) And he testified that Otamedia changed its sales policy—coincidentally, "over the last month"—such that customers can no longer order only one carton of cigarettes, but must now purchase them in units of two or more. (*Id.* 232–33.) But these discrepancies were simply too glaring, frequent, and improbable, and they reveal the data to be, at best, unreliable, and in all likelihood, entirely fabricated.

Indeed, confronted with Finnie's analysis and upon further cross-examination, Messina effectively conceded that the Court cannot rely on the sales data it produced to Philip Morris.[19] (Tr. 272–73.) Otamedia thereafter undertook to create new sales data, and on redirect, Messina ascribed the errors, discrepancies, and "statistical anomalies" of the old data to inept computer programmers, no longer working for Otamedia, who were inexperi-

---

19. On redirect, Messina testified to the accuracy and authenticity of the second batch of data, covering the months September 2003 through January 2004, which contained less blatant "errors" and "statistical anomalies." (Tr. 311.) Nonetheless, as cross-examination made clear, it can hardly be deemed reliable.

According to this batch of data, for example, Otamedia for some reason sold hundreds of cartons of "multifilter" Philip Morris cigarettes on the 22d and 23d day of each month, while on the remaining days it never sold more than a single carton of multifilter cigarettes. (PX LLL; Tr. 337–38.)

enced and lacked the skills properly to generate the data requested by Philip Morris. (Tr. 271, 317–25.) On May 28, 2004, Otamedia produced new sales data for the period May 2003 to January 2004.[20] (PX SSS.) Messina testified that this data, like the second batch of the old sales data (September 2003 to January 2004), had been prepared by Otamedia's current, "good" computer programmers. (Tr. 323–25, 343.)

At the threshold, it bears emphasis that this eleventh-hour production must be viewed with skepticism. Otamedia somehow developed it virtually overnight. Philip Morris's lawyers and experts lacked an adequate opportunity to review it. After Otamedia produced its purported data, as directed by the Court, to permit Philip Morris to verify Messina's initial claims, and that data turned out to be inaccurate and worthless, Otamedia's belated claim to have finally produced correct information is inherently suspect. At any rate, cross-examination quickly disclosed that the new information is hardly more reliable than the old. First, Messina, who, in his own words, has "absolutely" no expertise in programming (Tr. 343), took no steps to ensure the accuracy of this data except to vouch for Otamedia's new programmers. He did not review the data himself. (Tr. 335.) Nor did he compare the credentials or experience of the former Otamedia programmers to those of the current "good" ones. (Tr. 343.) Rather, Messina simply "recommended that they should do an accurate job" (*id.*), "the best job possible." (*Id.* 341.) Ultimately, however, he conceded that he has no reason at all to have more confidence in the new programmers than in the old ones. (Tr. 335–36, 343.)

Second, Messina told the new programmers not to include information about the price of the cigarettes or the particular kind sold, for example, Marlboro Reds or Marlboro Lights. (Tr. 331.) On cross-examination, he explained that Otamedia chose to redact this information because of some vague marketing interest in protecting itself against competitors. (*Id.*) Yet Otamedia included such pricing and brand information in its previous production. Messina characterized this as "a mistake." (*Id.* 332.)

Third, the new data also contains statistical anomalies suggestive of fabrication. For example, a comparison of the old data for the period September 2003 to January 2004, which Messina continued to insist is accurate (Tr. 311), and the new data for the same period, showed consistent *monthly* totals of Philip Morris brands for each of these months, but entirely different *daily* totals, with the exception of one day, December 20, 2003. (PX MMM; Tr. 339, 406–09.) Otamedia seeks to ascribe this to "parsing errors" (6/25/04 D. Br. 23) based on the testimony of its expert witness, Michael F. McGowan (Tr. 370–71), but as Finnie subsequently testified, even assuming that such errors account for some of the discrepancies, it remains "very far-fetched" to speculate "that the same set of circumstances would conspire across five months to generate this kind of data." (Tr. 409.) Moreover, as a matter of common sense, one would expect that Otamedia's sales over the course of any given month would fluctuate from day to day, depending on, for example, the day of the week or the presence of a holiday. But the new data, like the old, does not reflect any such fluctuations; according to Otamedia's purported records, its customers apparently spent roughly the same amount of time on the Internet purchasing cartons of

---

**20.** Otamedia apparently did not intend to produce a new batch of the September 2003 to January 2004 data (Tr. 339), for Messina continued to insist that the old data for this period was accurate. (Tr. 311.)

Philip Morris cigarettes on Thanksgiving and Christmas Day as on any other day. (PX MMM.)

Philip Morris notes additional discrepancies and analysis that undermine the new data's reliability. (6/11/04 P. Br. 19–32; 7/2/04 P. Br. 14–15.) But enough has been said to establish that even if Otamedia did not deliberately submit falsified data on repeated occasions, as the evidence strongly suggests that it did, none of its data, old or new, merits any evidentiary weight whatsoever. The Court finds it entirely unreliable, and indeed, based on the multiple discrepancies, errors, and statistical anomalies can only infer that Otamedia's sale of Philip Morris cigarettes to U.S. customers in violation of the Judgment far exceeds the 3% or 4% to which Messina testified.

## IV. comScore

Philip Morris introduced affirmative evidence to establish that a vast amount, if not a solid majority, of Otamedia's Internet business consists of selling Philip Morris cigarettes into the United States in violation of the Judgment. It retained comScore, "a consumer research company that provides Internet audience measurement services" by means analogous to those employed by Nielsen Media Research to estimate the popularity of various television programs. (Larrison Decl. ¶ 3; Tr. 62) James Maxwell Larrison, a senior vice-president of comScore, testified that the company maintains a panel of about 1.5 million people worldwide, about 1 million of whom reside in the United States, and "passively monitor[s] their online behavior . . . including purchases." (Tr. 17.) The panel consists of volunteers who allow comScore to configure their Internet browsers to send information through comScore's servers; comScore then collects that information by storing each page visited and extracting the data.[21] (Id. 21.) By an undisclosed methodology, comScore projects various statistics about Internet usage and retail sales for different websites, and attempts to validate the accuracy of these projections by certain quality controls, including by testing its statistics against those collected internally by the actual companies it seeks to monitor. (Id. 22–31.) Its methods, according to Larrison, have proved exceptionally accurate over time, and for that reason, academic, commercial, financial, news media, and government institutions use comScore's services. (Id. 22–24; PX A.)

Based on comScore's analysis, Larrison testified that between September 2002 and August 2003, the period about which Messina testified in his affidavits, between 86% and 98% of visitors to the Otamedia Website were located in the United States (PX C; Tr. 35–36, 40); and the number of Philip Morris sales, as a percentage of Otamedia's total cigarette sales into the United States, ranged from 51% to 76%. (PX D; Tr. 40–42.) Between September 2002 and March 2004, Otamedia sold about $224.9 million in cigarettes to customers located in the United States, $145.8 million, or about 65%, of which were attributable to Philip Morris brands. (PX D, G; Tr. 42, 52.) During the same period, less than 1% of Otamedia's sales to the United States consisted of products other than cigarettes, such as delicatessen items, cigars and wine.[22] (PX G; Tr. 46–48.) comScore could not estimate the number of non-U.S. sales with sufficient accuracy

---

21. comScore seeks to make its panel representative of the Internet community by various means. (Tr. 22.) Volunteers receive incentives, such as free virus scanning software or simply payments, to participate in comScore's research. (Id. 34.)

22. No comScore panelist purchased a delicatessen product until November 2003. (Tr. 48.)

because too few of its panelists outside the United States purchased any cigarettes at all from the Otamedia Website. (Tr. 39, 50.) In short, comScore's projections contradicted Messina's representations about Otamedia's sales in virtually every respect (Tr. 51–52.)

Because comScore, to protect its trade secrets, declined to disclose its methodology (Tr. 73), the Court cannot adequately assess the reliability of comScore's methods for projecting likely total sales from the actual purchases made by its panel members. James Bernhard Sterne, an expert for Otamedia, testified that, in his opinion, comScore's methodology has not been subjected to adequate peer review and suffers from several potential errors that make its projections of questionable accuracy. (Tr. 168–76.) On cross-examination, Sterne conceded that he does not *know* that comScore's data and statistical methodology suffer from errors; he simply has no means to assess it. (Tr. 187–89.) But based on his "experience in the industry, an aggregate of anecdotal information," "reading an article here, talking to an individual there, talking to a client here," and "listening to the industry buzz," he would not rely on comScore's projections and disagrees with Larrison's testimony. (*Id.* 191.)

The Court found Larrison to be a highly credible witness. He testified knowledgeably, candidly, and confidently about comScore. Nevertheless, out of an abundance of caution and because comScore declined, understandably, to disclose its methodology, the Court declines to rely on comScore's *projections* of Otamedia's sales of Philip Morris cigarettes into the United States. That said, the Court notes that,

even unaided by complex algorithms or statistical models, the *raw data* on which comScore relies, which Otamedia cannot dispute, alone suffices to prove that far more than 3% of Otamedia's sales violate the Judgment.[23] (Tr. 53–59; PX SS.)

First, for certain days, comScore's raw data reveals that its panelists *alone* purchased more cartons of Philip Morris cigarettes than Otamedia's sales data reflects were sold to the entire world. (Tr. 57–58, 145–49, Exs.SS, CC–GG, BBB.) Second, the overwhelming majority of comScore panelists who visited the Otamedia Website reside in the United States (Tr. 35–36), and the overwhelming majority of purchases made by those U.S. visitors, in excess of 99%, consisted of cigarettes. (*Id.* 47–48.) Third, too few non-U.S. visitors on comScore's panel purchased cigarettes for comScore to estimate with any degree of certainty the proportion of non-U.S. sales. Without drawing any inference about the actual volume of non-U.S. sales, it is reasonable to infer that Otamedia's representation that non-U.S. residents account for the majority of its cigarettes sales is false. Finally, while the Court eschews reliance on comScore's particular projections in view of the inability to appraise the reliability of comScore's methodology, a common sense estimate, based on the actual sales to comScore panelists, would put Otamedia's sales of Philip Morris cigarettes into the United States at far more than the negligible figure of 3% or 4% asserted by Otamedia.

V. *Summary of Findings Regarding Otamedia's Sales*

Taking together the inference from Otamedia's refusal to comply with the

---

**23.** Although the Court cannot determine the precise relationship between the purchases of comScore panelists and those of Internet users at large, Otamedia offers no persuasive reason, and the record reveals none, to view those panelists as *un*representative or to believe that their use of the Otamedia Website differs in any significant or systematic way from that of Otamedia's customers in general.

Judgment and simply stop selling Philip Morris products into the United States; the nature of the Otamedia Website, which plainly reveals a business plan focused on sales that violate the Judgment; the complete unreliability of Otamedia's supporting testimony and data, which is so riddled with fabrication and deception as to warrant the inference that the truth is the exact opposite of what Otamedia contends; and the affirmative evidence of the behavior of the comScore panelists, which shows an overwhelming use of the Otamedia Website for purposes that violate the Judgment, the Court finds: *first,* that Otamedia's Internet business is devoted, almost exclusively, to selling cigarettes; *second,* that it sells a substantial percentage, and very likely a majority, of such cigarettes to customers located in the United States; and *third,* that a substantial percentage, and likely a majority, of its cigarette sales consist of gray market Philip Morris cigarettes sold into the United States, and therefore violate the Judgment.

## CONCLUSIONS OF LAW

■ Philip Morris seeks an evidently novel form of relief: the modification of a judgment to include an order transferring ownership of the Internet domain names by which the defendant persists in violating injunctive relief afforded by that judgment. But while the technology and particular enforcement-mechanism contemplated by Philip Morris's application may be new, the applicable law is not. A court of equity enjoys clear power to modify an injunction. *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Sys. Fed'n No. 91, Ry. Employees Dep't v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) ("[A]n injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief."); *cf. Berger v. Heckler,* 771 F.2d 1556, 1569 (2d Cir.1985) ("Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."). When a party seeks modification of an injunction previously entered against it, "[t]he inquiry," in Justice Cardozo's felicitous words, "is whether ... dangers, once substantial, have become attenuated to a shadow," for "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation." *Swift,* 286 U.S. at 119, 52 S.Ct. 460.

■ But where, as here, it is not the enjoined party that seeks relief from an injunction, but the injunction's beneficiary that seeks to enforce it more effectively, equity countenances the modification of a injunctive decree if "a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 418 F.2d 31, 35 (2d Cir.1969); *see also N.Y.S. Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 969 (2d Cir.1983); *Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc.,* 793 F.2d 1529, 1538–40 (11th Cir.1986.). Indeed, at least in the context of anti-trust injunctions, the Supreme Court has emphasized that "[t]he trial court is charged with inescapable responsibility to achieve [the injunction's] objective, although it may, if circumstances warrant, accept a formula for achieving the result by means less drastic than immediate dissolution or divestiture." *United States v. United Shoe Mach. Corp.,* 391

U.S. 244, 250–51, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). Therefore, while the Court "may, if circumstances warrant," fashion a less severe remedy than one that will, in Otamedia's view, destroy its business, the Court's paramount obligation must be to ensure compliance with the Judgment.

Otamedia objects that before ordering transfer of its domain names, the Court should consider less drastic measures by which Philip Morris could attempt to enforce the Judgment, for example, by moving for sanctions, registering its trademarks with U.S. Customs, bringing an action before the International Trade Commission ("ITC") or seeking enforcement of the Judgment in Switzerland. (9/8/03 D. Br. 6.) These suggestions lie ill in the mouth of a party that has consistently and deliberately violated the Judgment in the past, and not only declines to represent that it will comply in the future, but affirmatively declares that it will not.[24] (Tr. 280.) Were Otamedia to abide by the Judgment, Philip Morris would not be requesting the allegedly drastic measure to which Otamedia so strenuously objects. Nor would the Court be inclined to consider a modification of the Judgment that could effectively prevent Otamedia's lawful as well as unlawful sales if a less severe measure would ensure compliance. But Otamedia chose not to defend this action, deliberately permitting an injunction to be entered against it. After the entry of a default judgment, Otamedia chose not to comply with the injunction ordered by the Court. And after the Court gave Otamedia an opportunity to establish that only a small percentage of its business violates the Judgment, rendering the requested relief inequitable, Otamedia chose to provide manifestly unreliable, if not deliberately fraudulent, information, through a single fact witness who, at best, knew nothing about the issues relevant to the relief requested, and at worst, but more likely, perjured himself.

Before this proceeding, Otamedia evidently calculated that its elusive and ephemeral location, coupled with the "virtual" nature of its business, placed it safely beyond the reach of conventional enforcement measures available to a U.S. federal court. But "[l]ife is never static, and the passing of a decade has brought changes to the [Internet retail sales] business as it has to every other." *Swift,* 286 U.S. at 119, 52 S.Ct. 460. Philip Morris has now identified an efficacious means to enforce the Judgment, a means inherent in the very same technology by which Otamedia has to date been able to violate it with impunity. By modifying the Judgment to include this means, the Court can, if not prevent Otamedia's unlawful sales entirely or in perpetuity, at least impede them.

---

**24.** The Court, in any event, has considered the alternatives suggested by Otamedia, and finds them manifestly ineffective to ensure compliance with the Judgment. Philip Morris notes in a supplemental memorandum of law that it already has informed U.S. Customs that it does not consent to Otamedia's importation of Philip Morris cigarettes into the United States, and that "while an ITC action may theoretically be an option," those actions generally take more than one year and, at any rate, "there is no indication that Otamedia would comply with an ITC order any more than it would comply with an order of this Court." (9/30/03 P. Br. 13–14 n. 11.) Customs registration, similarly, has not forestalled Otamedia's unlawful sales because Otamedia's shipping procedures "have thwarted U.S. Customs' enforcement efforts to date." (*Id.*) Finally, an order imposing sanctions on Otamedia would likely remain only a paper judgment like the Judgment already in place, in view of the difficult and uncertainty of collecting such sanctions from an elusive foreign entity like Otamedia. *See* note 1 above.

When it becomes clear that an injunction has failed to achieve its principal objective, "the time has come to prescribe other, and if necessary more definitive, means to achieve the result." *United Shoe Mach. Corp.*, 391 U.S. at 252, 88 S.Ct. 1496.

■ The Court has "authority to enjoin actions otherwise lawful when such action is deemed . . . necessary to correct the evil effects of unlawful conduct." *United States v. United Liquors Corp.*, 77 S.Ct. 208, 210, 1 L.Ed.2d 32 (1956); *see also United States v. Loew's, Inc.*, 371 U.S. 38, 53, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (noting that "[t]o ensure . . . that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined"; collecting cases); *Sizzler Family Steak Houses*, 793 F.2d at 1540; *cf. United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724, 64 S.Ct. 805, 88 L.Ed. 1024 (1944) ("Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole.").

To be sure, as Otamedia points out, federal courts hesitate to sweep within an injunction a needlessly broad range of lawful conduct so as effectively to enjoin unlawful conduct (9/8/03 D. Br. 5; 6/25/04 D. Br. 11), *see Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir.1997); *Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2d Cir.1996), and most cases where they have done so involve anti-trust violations. *See United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir.1985). But where, as here, no more narrowly-

tailored relief would be effective, and the defendant has made absolutely clear that it will not comply with the injunction, a modification that incidentally proscribes certain lawful conduct is "necessary and appropriate in the public interest." [25] *Id.* While "[c]ourts commonly have exercised this extraordinary power only in antitrust cases, [the Court] see[s] no reason why it would not be available when necessary and appropriate in cases involving other areas of substantive law," such as intellectual property. *Id.; see also Swann v. Charlotte–Mecklenburg Bd. of Educ.* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for . . . . [t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.") (citation and internal quotation marks omitted); *cf. Berger v. Heckler*, 771 F.2d 1556, 1568–69 (2d Cir.1985) (emphasizing, in the context of contempt proceedings, that "a district court may take such steps as are appropriate given the resistance of the non-compliant party," and that "[e]nsuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt").

■ Here, the evidence establishes that Otamedia's sales of Philip Morris cigarettes into the United States in violation of the Judgment constitute a large proportion, if not the mainstay, of its business, and its claim that its legitimate business

---

**25.** Such a modification is especially appropriate where the great weight of the evidence establishes that a substantial percentage, and likely a clear majority, of the conduct that will be effectively proscribed by the modified injunction is *un*lawful. The Court therefore does not find the argument that the relief Philip Morris seeks will proscribe a limited amount of lawful conduct particularly compelling. (6/25/04 D. Br. 11–12.)

outweighs its violations of the Judgment has not remotely been supported by the evidence. Otamedia's past violations of the Judgment, its overt refusal to represent that it will abide by the Judgment in the future, and its submission of unreliable, and likely fraudulent, information in an effort to mislead the Court about the percentage of its business that violates the Judgment, all counsel in favor of granting Philip Morris the relief it now seeks; and the Court's equitable authority to grant that relief is clear.[26]

### CONCLUSION

Accordingly, it is hereby ORDERED that the yesmoke.com and yessmoke.com domain names be transferred to Philip Morris USA Inc. forthwith.

SO ORDERED.

---

**26.** Otamedia's makes two other arguments: first, that "[t]he Lanham Act simply does not bar importation of goods where the 'authorized imports' and 'parallel imports' are not materially different," and hence, "Philip Morris should not be able to stop Otamedia from selling [Philip Morris] cigarettes in the United States, unless there is a material difference between these cigarettes and the cigarettes Philip Morris actually sells in the United States" (9/8/03 D. Br. 7); and second, that the equitable doctrine of laches applies to bar the relief requested. (*Id.* 8.) The former argument attempts to raise issues of law and fact to dispute the merits of the Judgment. Otamedia forfeited its right to do that by electing not to defend against Philip Morris's complaint. Equally, the equitable defense of laches, even assuming it applies here, should have been raised as an affirmative defense in answer to the complaint. The Court is also mindful of "the equitable maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Otamedia's hands, to say the least, fail to qualify.